Nott, J.,
dissenting:
In Garfielde’s Case (11 C. Cls. R., 592, 93 U. S. R., 242), the Post-Offi.ce Department advertised for an entire service, or route, but said that the bidder might also state separately in his proposals for what he would perform a part of the service or half the route. The bidder said nothing about the entire service in bis bid, but offered to perform the partial service at a price specified. A majority of this court held that the acceptance of that offer did not make a contract; but the Supreme Court, on appeal, reversed the decision, and held that the advertisement, proposals, and acceptance made a valid executory contract, notwithstanding that the parties mutually contemplated a formal written contract, which should, with more particularity, express their joint agreement.
In this case, in precisely the same manner, the officer in charge advertised for the entire service of building the pier and abutments of the Bock Island Bridge; but said in his advertisement that bidders might also state separately in their proposals for what they would build the “ masonry” of the piers and abutments, and for what the coffer-dams, which constituted the remainder of the whole work. The claimants here said nothing about the entire work, nor about the coffer-dams, but -offered 11 to build the masonry of the piers and abutments ” at, say, $12 a yard. The officer in charge accepted their offer; and that, under the decision of the Supreme Court in G-arfielde’s Case, and likewise under the decision in the Insurance Company y. Hearne (20 Wall., 404), made the contract, unless it was intentionally modified or changed by the subsequent act of the parties. What was their subsequent action 1
No subsequent negotiation took place, nor any attempt was made on either side to change or modify what was thus agreed upon. A formal written contract was drawn up by a clerk and executed by the parties. On the one hand, there was no fraudulent representation made to the claimants in consequence of which they ignorantly signed the instrument; on the other, there was no intermediate negotiation to show that the formal *339 contract was an intentional departure froni tbe terms of tbe claimants’ bid.
Before tbe work began, General Hodman was removed and soon after died. His successor, judging oidy from tbe terms of tbe contract wbicb be found already made for him, very properly held tbat tbe claimants must build tbe coffer-dams; but there is no contemporary act of General Rodman to show tbat be understood tbat tbe formal instrument departed from tbe terms of tbe existing agreement, and in effect made an entirely new contract. Tbe case stands as if be had died immediately after executing tbe contract, leaving tbe court free to judge from tbe terms of tbe two instruments (tbe advertisement and bid on tbe one band and tbe formal contract on tbe other) whether tbe latter effected any alteration of tbe former, and whether such a change was a matter of agreement or of mistake.
I am of tbe opinion that no change of the existing agreement was intended, and tbat tbe evidence is overwhelming, or, as Lord Tburlow termed it, “irrefragable,” to establish a mistake. Indeed, I do not hesitate to say tbat no case of mistake can be found in tbe books where the evidence of mutual intention and mutual mistake is so satisfactory, and indeed incontrovertible, as in tbe case now before me.
In the first place, General Rodman, who for tbe purposes of this inquiry must be considered as tbe defendant, bad previously estimated tbe total cost of these piers and abutments at §34 a yard, including therein tbe stone, sand, and cement wbicb tbe Government was to furnish. Tbe average of tbe claimants’ bid was less than $13 a yard. It is therefore impossible tbat General Rodman could have misunderstood tbe value of tbe tiling contracted for, or have ignorantly supposed tbat tbe other party, in tbe language of bis advertisement, was “ willing to complete tbe work ” at less than $13 a yard, which be knew to be worth nearly $34. He knew also tbat bis advertisement invited proposals for tbe complete work and for tbe masonry alone, and tbat tbe claimants’ proposal “ to build the masonry ” agreed in terms and in value with both bis previous advertisement and bis previous estimate. Tbe concurrence of tbe parties’ previous' terms and previous estimates hardly ever occurs in such cases, and when they come together as they do here, they lift tbe case out of tbe uncertainties of parol evidence *340 and make it clear that a mutual mistake was committed or an unconscionable advantage obtained.
In the second place, the only competing bid placed the value of the completed work at $19.10 a yard, (an amount closely agreeing with General Ilodman’s own estimate;) the value of the masonry at $12.70 a yard, (an amount closely agreeing with the claimants’ offer;) and the value of the coffer-dams at $63,700. General Bodman thereby again had his attention called to the fact that the claimants’ bid was to do only a portion of the work.
If any doubt could have existed in General Bodman’s mind as to the meaning of the claimants’ proposal, none possibly could have existed as to the meaning of Beynolds, Saulpaugh & Go.’s, and when they named $12.70 for the masonry alone, and the claimants (in round numbers) $12, and both of these offers harmonized with his own previous estimate, he must have understood that they referred to one and the same thing, the partial sendee, and not the completed work.
In the third place, this was not a trivial thing, that might have been incidental to the contract. The variance here between the consideration of the first, or preliminary, and the second, or formal, contract exceeded the variance in any case, English or American, that has been cited on the argument. In The Insurance Company v. Hearne (20 Wall., 404), the variance was 17 per cent., and the difference of consideration amounted to but $20. In this case the variance was 54 per cent., and the difference of consideration amounted to $63,700. This deviation from the primary contract, and from the well-understood value of the work, was not only great, but monstrous — monstrous in ratio and monstrous in amount. The magnitude of the wrong commends the case in the strongest manner to the consideration of a court of equity, and makes such cases as The Insurance Company v. Hearne (supra), and Mortimer v. Shortall (2 Dr. & War. R. 363), where relief was granted and the contracts reformed, seem utterly insignificant.
The only contemporary act or utterance of General Bodman which can have any bearing upon the question of mistake was cited by the defendants upon the argument and relied upon to show that no mistake existed on his part. It was this:
When the bids were opened, so a witness for the defendants testifies, “General Bodman remarked something to this effect: *341 That the bid of Reynolds, Saulpaugh & Co. was high, and that their bid (referring to the claimants) was very low; and he asked them if they understood what they were bidding on, or understood their business, and whether their bondsmen knew.” The same witness also testified that the contract was not awarded immediately, but that General Rodman said “that he would look over the bids again and let them (the claimants) know in a few days.” Now, what were these bids that it would require a few days for General Rodman to examine1?
It was stated in the claimants’ bid that they would build the masonry of the “smallpiers and abutments” at $11 a yard, and that of the “drone-pier” at $13. Reynolds, Saulpaugh & Go., on the contrary, made no distinction, and offered to build the masonry of all at $12.70 a yard. It has been assumed in the hearing of the case that the claimants’ bid averaged $12 a yard. But such is not the fact. The estimated quantity of masonry at the time was 10,000 yards, and, according to General Rod-man’s plans, then shown to the bidders, the draw-pier (as subsequently calculated by General Warren when testifying in the case) would contain but 4,006 yards. The bids, therefore, which were-to receive General Rodman’s consideration, when analyzed, would stand thus:
The claimants7. Reynolds, Saulpaugh & Go.’s.
4,000 yards, at $13... $52,000 10,000 yards at $12.70, $127,000 6,000 yards,at$11... 66,000
Total. 118,000
Bquivalentto $11.80 per yard.
Here, then, was a difference of $9,000 in favor of' the claimants; or reducing it to-the price per yard of the then estimated quantity, they offered to do the work of building for an average of $11.80 per yard, while Reynolds, Saulpaugh & Co. demanded $12.70.
Conceding that this witness of the defendants, who testified three years after the event, has given the precise language of General Rodman, this difference of nearly $1 a yard may well satisfy his remark that the bid of the one party urns high and that of the other very low.
Furthermore, it is manifest that, if General Rodman understood the claimants’ bid in the sense of the subsequent formal *342 contract, there was no need of Ms taking time to consider. As between $19.10 a yard and $11.80 a yard — as between $191,000 and 118,000 — there was no room for doubts and no necessity for reflection.. But if General Bodman found the one party bidding $12.70 a yard for all of the masonry and $63,700 for the cofferdams, and the other party bidding $13 for the draw-pier and $11 for the others, he might well devote some time to calculating the dimensions of the draw-pier and in determining whether he would accept the bid for the coffer-dam.
I am aware that there is some evidence in the case intended to show by the testimony of prejudiced witnesses, taken several years after the event, certain loose admissions by the claimants to the effect that they understood their bid in the sense of the subsequent contract. But, beside the “ irrefragable ” documentary evidence and written agreements of the parties, this testimony of parol admissions merely illustrates the characterization of all the authorities, that such testimony is the weakest, the most dangerous, the most suspicious evidence admissible in courts. Indeed, it is to be noted here that, unlike such cases generally, all of the evidence relied upon by the claimants to establish the mistake is documentary and indisputable, while all of the evidence relied upon by the defendants is parol, and of the loosest and most unsatisfactory character.
Passing now to the law of the case, I observe that while courts have reiterated in a general way the phrase that the mistake must be mutual and common to both parties to the instrument, yet, nevertheless, the cases, though unclassified, fall, so far as the evidence of mutual mistake is involved, into two classes. Where the instrument sought to be reformed is the first written agreement between the parties, and the evidence to establish the mistake is parol or exparte written memoranda (Lyman v. United Insurance Co., 2 Johns. Ch. R., 630), there courts of equity require the strongest and most convincing proof that all preliminary negotiations were not intentionally merged in the written instrument. And, indeed, until the case of Gillespie v. Moon (2 Johns. Ch. R., 585), it was supposed that parol testimony cQuld not prevail against the,sworn answer of the defendant denying his own mistake. (Irnham v. Child, 1 Bro. Ch. R., 93.) But where a primary valid written contract existed between the parties, and the contract sought to be reformed is a secondary formal instrument contemplated by the *343 first, and intended to cany into effect its provisions with, increased particularity and care, as where a written contract to assure contemplates a formal policy of insurance, or where articles of dissolution of partnership contemplate a bond of indemnity to one of the partners, there, as was said by Chief Justice Marshall in Finley v. Linn (6 Cranch 238), the second in-instrument “may be restrained” by the first.
Thus, in the recent case of The Insurance Company v. Hearne (before cited), there was not a particle of evidence (so far as the decision discloses) to show mistake on the part of the insurance company when they executed and sent their policy. Undoubtedly their officers would have testified that they knew precisely what they were doing, and meant that the policy should cover no more than it expressed; yet the Supreme Court, while reiterating the general principle that the mistake must be mutual, did not hesitate to ascribe mistake to the policy, and upon the express ground that it departed from the primary agreement. Thus, too, there may be cases where the instrument sought to he reformed is in the handwriting of the defendant, and where it was morally impossible that he was mistaken as to what he had himself written; yet elementary writers have not hesitated to say that “relief upon a defective instrument is the more readily afforded when the party to he charged thereon is himself the person who prepared or perfected it.” (Kerr, Fraud and Mistake, 421.)
The fact is, and alwaj’s has heen, that where the defendant stands in the dilemma of having made a mistake in good faith, or of having obtained an unconscionable advantage in bad faith, courts of equity will ascribe mistake to his act without evidence, and will not allow him to impute gu asi fraud to his own act. And, generally, it may be said that where there was a valid written con-tractbetweentheparties, and the second instrument sought to be' reformed was intended to carry out and give effect to the first, hut departed from it without intermediate negotiations to give color to the intent of a departure, and was written or prepared hy a defendant who obtained an advantage hy the alteration, courts of equity have never yet refused relief, and have never yet stopped to inquire whether the defendant did not know what he was about, or intended the alteration which he ex parte effected.
Equity exacts the utmost good faith; and where two men *344 are bound to each other by a common agreement, and one of them allows the other to execute an instrument which he has himself prepared, in the belief that it carries out the intent of the first, while in fact it departs from it to the benefit of the party who prepared it, the suypressio veri, though not fraud at law, is nevertheless the “unconscionable advantage” spoken of in the books.
As great stress has been laid upon the illustrative cases cited bj' the Supreme Court in The Insurance Co. v. Hearne I proceed to examine them all, for the purpose of ascertaining whether there be one which requires positive evidence of mistake on the part of the defendant in a case like this; that is to say, in a case where the instrument sought to be reformed departs from a valid written contract which it was intended to carry out.
Beaumont v. Bramley (1 Turn. & Rus., 41), the evidence to establish the mistake was parol; the deed sought to be reformed recited a more extended agreement than the plaintiff set up; the original parts'- to the contract was dead, and had averred no mistake in his lifetime; his agent who negotiated the business had acknowledged the correctness óf the deed sought to be reformed ; the agent of the other party was not called as a witness j in short, the proofs utterly failed to establish a mistake by anybody. The opinion of Lord Eldon, on the contrary, has a direct bearing upon the present case, and forms high authority to sustain the distinction which ’ courts of equity have always made between the two classes of cases: uThere is no doubt,” he says, “that if an instrument affects by its recital to carry into execution a certain agreement and goes beyond that agreement, the court will rectify it$ because then it has clear evidence on the face of the instrument itself that the instrument operates beyond its intended operation.” In other words, where a valid written ■agreement takes the place of parol evidence in establishing the mistake, á court of equity will not consider it a matter of reasonable doubt that a mistake occurred.
In Breadalbane v. Chandos (2 Myl. & Cr., 711) there were written “proposals” between two fathers concerning a marriage settlement for the daughter of oneof them. • These “proposals,” it was subsequently claimed, implied that the marriage portion should exdlude the daughter, according to a Scottish custom, from futureparticipation inherfather’s estate. After the father’s' death his other heirs sought to maintain this by reforming the *345 marriage settlement after marriage. Brit the court held that tlie “proposals” did not imply an exclusion, and that if they did, they were strictly between the two fathers, and did not amount to a contract between father and daughter. In other words, this case also broke down utterly upon the proofs, and failed to .show either a mistake or an agreement.
As to Fowler v. Fowler (4 De Gex & J., 250), it is enough to say of it what Lord Chelmsford said of it in his decision, that the agent who acted for the plaintiff could not have made the mistake complained of; that •“ his conduct upon that supposition is quite inexplicable.”
Sells v. Sells (1 Drew. & Sm., 42) was a clear case of misunderstanding, where the plaintiff in good faith intended one thing and the defendant in good faith intended another. In a conversation relating to an antenuptial agreement, it was proposed that all “after-acquired property” should be subject to its provisions. The husband understood this to mean the wife’s after-acquired property, but her representative understood it to refer to the husband’s, and so it was'stated in the contract. After marriage he sought to reform the antenuptial agreement for his own mistake, and, it is needless tó add, did not succeed.
Lloyd v. Cocker (19 Beav., 140) was another marriage settlement case, being an attempt to break a trust. The master of the rolls (Romilly) disposes of the case in a single sentence when he sajs: “ This settlement was made in 1827, now twenty-seven years ago, and no mistake was discovered till now, when the father and daughter want to dispose of the fend.”
Rooke v. Lord Kensington (2 Kay & J., 753) is a prolix and involved case, but, when analyzed, it amounts to nothing more than this, that the plaintiff assumed that a certain property did pass by.a certain mortgage, and asked to have the description corrected for mistake; but Lord Hatherly, then vice-chancellor,. held that by a proper construction of the mortgage the property was not included in the description, and consequently that there was no ground of mistake and no necessity for relief.
Eaton v. Bennett (34 Beav., 196) was another wild attempt to reform an antenuptial agreement after marriage, where, moreover, the plaintiff knew of the. so-called mistake before marriage, and in fact executed the agreement under what he called a protest. The wonder is that such a case should be cited as one of mistake, or, indeed, that it ever found its way into the reports.
*346 Mortimer v. Shortall (2 Dr. & War. 363) is the last of the cases cited to show that the mistake must be mutual, and the evidence such as to leave no reasonable doubt upon the mind of the court. Of it several things should be noted: first, that the maxims did not prevail against the case, for the plaintift succeeded in having the deed reformed; second, that this was done entirely upon ]>arol and circumstantial evidence, for the deed was the first and only written agreement between the parties; third, that the injury caused by the alleged mistake was trivial and the departure from the intended agreement slight, inasmuch as the -mistake was merely ah omission to except from the operation of a lease six acres out of one hun dred and thirty-six, and the rent was per the acreage; fourth, that Lord St. Leonard, while commenting upon the difficulty of reforming a deed upon nothing but parol testimony, and the necessity of having evidence which shall leave the mind of the court free from doubt, expressly says that “thereis no objection to correct a deed by parol evidence when you have anything in writing beyond the parol evidence to go by.”
It is, therefore, very clear to my mind that there is not one of these cases which bears the slightest resemblance to the one now before us, or which is an authority for saying that there must be other evidence of mistake than a preliminary written agreement.
As to the private act under which we take jurisdiction, I am of the opinion that the words which refer to this court the claimants’ claim “for alleged labor done and materials furnished under their contract,” are words- of description and not words of limitation. The latter part of the act empowers this court to proceed, “as a court of equity jurisdiction,” to “reform said contract,” and to “ render such judgment as justice and right between the claimants and the said Government may require.” At the time when the mistake was discovered, the claimants had no court of equity into which they could bring the Government, either to reform the contract because of the mutuality of the mistake, or to rescind it because of their own. I hold that the purpose of the private act was to cure that defect of jurisdiction, and that it confers upon this court the most ample power to do justice, either by reforming the contract for mutual mistake, or by treating it as rescinded for the mistake of the claimants, and awarding them damages upon an account for such work as was addi *347 tional to that contemplated by tbeir bid. Ordinarily, private acts are of tbe nature of grants, and are to be strictly construed; but private acts referring controversies between tbe Government and its citizens to judicial tribunals for judicial redress are of tbe nature of remedial statutes, and are to be construed so as to carry out tbe just intent of tbe legislature. There bave been but two of these private acts that bave gone to tbe Supreme Court for construction, and in both instances that court overruled tbe strict construction of this, and construed them liberally as remedial statutes. (Cross’s Case, 8 C. Cls. R., 1; Roberts's Case, 11 id., 98.)
Upon tbe whole case, I am of tbe opinion that tbe contract should be reformed so as to conform to tbe terms of tbe prebmi-nary contract between tbe parties, and that tbe claimants should recover for tbe coffer-dams as for extra work done under tbe contract as reformed.